# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

LISA M. MEINCZINGER,            )
                                )
    Plaintiff,            )
                                )
v.                              )        Case No. 4:10-CV-02390 NAB
                                )
MICHAEL ASTRUE,                 )
                                )
    Defendant.            )

## MEMORANDUM AND ORDER

This is an action under Title 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael Astrue ("Defendant") denying the application of Lisa Meinczinger ("Meinczinger") for

disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-435, and

social security income under Title XVI of the Social Security Act, 42 U.S.C. § 1381 – 1383.

Meinczinger filed a Brief in Support of the Complaint. [Doc. 17]. Defendant filed a Brief in

Support of the Answer. [Doc.18]. The parties have consented to the jurisdiction of the

undersigned United States Magistrate Judge in this matter. Therefore, this judgment is entered

pursuant to 28 U.S.C.A. § 636(c)(1).

### I. Procedural History

Meinczinger filed an application for a period of disability and disability insurance

benefits on January 14, 2009. (Tr. 137-138.) Meinczinger's claims were denied at the initial

determination level and she filed a timely request for a hearing before an Administrative Law

Judge ("ALJ"). (Tr. 101-102.) The ALJ held a hearing and denied the claim in a written

decision dated April 23, 2010. (Tr. 23-38.) The Appeals Council granted Meinczinger's request

for review of the ALJ's decision.  (Tr. 5.)  In an October 22, 2010 decision, the Appeals Council found that Meinczinger is not disabled based on her ability to do sedentary work.  (Tr. 5-7.)  As such, the Appeals Council decision stands as the final decision of the Commissioner.

### Medical Records

On May 2, 2006,  Meinczinger was admitted to Barnes Jewish Hospital where Rick Wright, M.D., ("Dr. Wright") performed unicondylar arthroplasty on Meinczinger's left knee. (Tr. 396-97, 486.)  Dr. Wright noted that Meinczinger "tolerated the surgery well" and experienced no postoperative complications.  She was administered antibiotics for 24 hours after the operation and prescribed various pain and anti-inflammatory medications, including Vicodin. Meinczinger began continuous passive motion and discharged on May 5, 2006.  Her discharge activities included home physical therapy, wound check and bandage replacement as needed, weight bearing as tolerated with a walker, and continuous passive motion for six to eight hours per day.  Dr. Wright prescribed her a continuous passive motion device on May 3, 2006.  (Tr. 486.)

On May 17, 2006, Dr. Wright removed Meinczinger's knee staples and noted that she was "doing great without real complaints."  Meinczinger's left knee range of motion was about 0-90 degrees and x-rays showed a well-aligned, well-seated, cemented unicondylar knee arthroplasty in the expected position.  Dr. Wright planned for Meinczinger to continue using a walking aide and return in one month for a six week check-up.  (Tr. 288.)

On June 14, 2006, Dr. Wright noted that Meinczinger continued to struggle with her range of motion.  Upon physical examination, Dr. Wright noted that Meinczinger had 1+

2

effusion, moderate soft tissue swelling, and her range of motion was 0-90 degrees, but as high as 105 degrees with overpressure. He recommended that she continue rehabilitation and return for follow-up in six weeks. (Tr. 290.)

On July 7, 2006, Meinczinger received a reevaluation from Shannon Layton, PT, at St. Charles Sports and Physical Therapy. Meinczinger reported that she remained stiff and sore after treatment sessions and that she continued to have difficulty sleeping. Layton noted that Meinczinger walked with increasing heel strike and flexion, however, "hip hiking" occasionally occurred. (Tr. 325.)

On August 2, 2006, Meinczinger reported persistent anterior left knee pain and swelling. Upon examination, Dr. Wright noted trace effusion and some scar formations, that produced palpable grinding with range of motion. X-rays revealed a well-positioned lateral unicondylar knee arthroplasty. Dr. Wright noted that Meinczinger was "doing well," and planned for her to continue physical therapy. His notes state that he hoped that the combination of strength and range of motion exercises would break up any residual scar tissue and relieve her anterior symptoms. (Tr. 292.)

On October 23, 2006, Meinczinger complained of significant grinding in her left knee. Dr. Wright noted that the grinding seemed consistent with either excessive scar tissue or the patella getting caught on the implant. Dr. Wright noted Meinczinger's continued inability to achieve pain free range of motion. Meinczinger had no varus, valgus, anterior or posterior instability and her range of motion improved to 0-125 degrees. She had a small effusion, however, and +3 patella crepitus. He found no obvious concerns on Meinczinger's x-rays. Dr.

Wright recommended arthroscopic lateral retinacular release, in addition to an arthroscopic evaluation and debridement, if Meinczinger was found to have some impingement between the implant and her patella. (Tr. 295.)

On November 21, 2006, Dr. Wright performed anthroscopic patella chondroplasty, extensive arthroscopic debridement of articular cartilage along the lateral facet, lateral gutter, and the anterior and anteromedial gutters. He also performed an anthroscopic lateral retinacular release and an open patellar tendon release, which "significantly freed up the patella and decreased the crepitus and grinding in the anterior knee." (Tr. 398-99.)

On December 4, 2006, Meinczinger followed up with Dr. Wright regarding her November 2006 surgery. Dr. Wright noted that Meinczinger was doing "fairly well," but had continued swelling and complained of pain. On physical examination, Meinczinger had 2+ effusion and an active range of motion of 0-100 degrees. Dr. Wright ordered Meinczinger to continue to ice and elevate her knee. He increased her physical therapy to three times per week and prescribed Vicodin ES. (Tr. 298.)

On December 27, 2006, Meinczinger returned to Dr. Wright with continued pain and struggle with the range of motion in her left knee. Examination revealed 2+ effusion, a range of motion of 0-90 degrees, and some crepitus at the start of 90 degrees of flexion. While Dr. Wright concluded that Meinczinger was "doing reasonably well," he also noted that she may need to consider total knee arthroplasty if she ultimately failed to improve. Dr. Wright planned for Meinczinger to continue range of motion and strengthening exercises and return in six weeks for a rehabilitation check. (Tr. 300.)

On February 7, 2007, Meinczinger saw Dr. Wright for a follow-up visit. She reported no significant improvement in her knee, was "very frustrated" by the process, and wanted to consider other options. Dr. Wright noted that Meinczinger received no benefit from the debridement and release surgery after three months. Due to Meinczinger's significant crepitus, pain, and obvious involvement of the patella, he recommended she consider total knee arthroplasty. Meinczinger was advised to continue rehabilitation and Dr. Wright concluded that total knee arthroplasty would be considered if Meinczinger failed to improve within four to six weeks. (Tr. 302.)

On March 30, 2007, Dr. Wright performed a left total knee arthroplasty on Meinczinger at Barnes-Jewish Main Campus. (Tr. 400-01.)

On April 9, 2007, Meinczinger was followed up with Dr. Wright at Barnes-Jewish West County for the March 30, 2007 left total knee arthroplasty. She reported extreme pain, extreme swelling, coldness, soreness, numbness and tingling. Examination revealed that her calf was moderately swollen and her range of motion was 0-80 degrees. She had full motor function in her peroneal distribution, where she reported tingling. Dr. Wright ordered an ultrasound to rule out deep vein thrombosis ("DVT"). X-rays showed a well-aligned, well-seated cemented revision total knee arthroplasty in expected position. Dr. Wright noted that he discussed Meinczinger's need to persevere through the soreness to work on her range of motion and strengthening. Her treatment plan included ice, elevation, and a return visit in one week for a wound check and staple removal. (Tr. 304.)

On April 16, 2007, Meinczinger saw Dr. Wright. He reported that she was "doing very well [and] making reasonable progress with physical therapy." Meinczinger's range of motion was 0-75 degrees. Dr. Wright suggested that Meinczinger continue to work on range of motion and strengthening and return in 3 ½ weeks for her six-week postoperative check-up. He referred her for physical therapy treatment and evaluation five times per week for four to six weeks. (Tr. 306.) Meinczinger saw Layton, PT, at St. Charles Sports and Physical Therapy who assessed that Meinczinger presented good rehabilitation potential, secondary to her motivation to return to her previous lifestyle. Meinczinger walked with a decreased heel strike gait pattern with the use of a standard walker. (Tr. 357.)

On May 14, 2007, Meinczinger saw Dr. Wright. She continued to make "reasonable progress." A physical examination revealed that her range of motion was 0-100 degrees, and 2+ effusion. X-rays showed a well-aligned, well-seated cemented total knee arthroplasty in expected position. Dr. Wright's treatment plan included continued rehabilitation and scheduled follow-up in six weeks for her three-month check-up. Meinczinger was to remain off work until the follow-up visit. (Tr. 308.)

On June 25, 2007, Meinczinger saw Dr. Wright for her three-month follow-up. (Tr. 310.) She reported some mild pain that mildly interfered with her daily activities. She also complained of pain at extremes of her range of motion. During physical therapy, she was able to reach 120 degrees of flexion with some pain. Otherwise, Meinczinger reported that she was doing well. Dr. Wright noted that Meinczinger was in no apparent distress, was readily able to do a straight

leg raise, and had a left knee range of motion of 5-110 degrees.  X-rays showed a total left knee arthroplasty in good position.  (Tr. 310.)

On July 30, 2007, Meinczinger saw Dr. Wright for her four-month postoperative follow-up from the total left knee arthroplasty.  Meinczinger was "doing well without complaints."  A physical exam showed zero effusion, and x-rays showed a well-aligned cemented total left-knee arthroplasty.  Dr. Wright released Meinczinger to full unrestricted work activities and anticipated she would be at maximum medical improvement in two months.  (Tr. 315.)

On July 31, 2007, Daniel Sullivan, M.D.,of St. Luke's Urgent Care completed a "Medical Examination for School Bus Operator's Permit" for Meinczinger, certifying that she was not "physically qualified to safely operate a school bus."  She had 20/20 vision in both eyes and passed a whisper test past five feet.  The only abnormal finding was her left-knee scar and cane use.  (Tr. 221).

On September 10, 2007, Meinczinger saw Dr. Wright for her six-month postoperative follow-up.  She was "doing well without complaints," but had "some scar grinding anteriorly."  Dr. Wright opined that Meinczinger reached maximum medical improvement and discharged her from his care.  She was released to work with permanent restrictions of no kneeling.  (Tr. 316.)

On March 17, 2008, Meinczinger saw Dr. Wright for her one-year postoperative follow-up.  Meinczinger was "doing well without complaints" and her x-rays showed a well-aligned cemented total knee arthroplasty in expected position.  Dr. Wright suggested that she return for further follow up in 4-5 years.  (Tr. 317.)

On October 20, 2008, Meinczinger saw Dr. Wright and complained that her left foot went cold, that her right shoe wore out faster than her left shoe. Dr. Wright noted that he could not give her an etiology for her uneven shoe wear and cold left foot. X-rays showed a well-aligned cemented left knee total arthroplasty in expected position. Dr. Wright reviewed the results of Meinczinger's physical exam, x-rays and medical history with her and her husband. Dr. Wright opined that he saw no apparent neurological or vascular compromise on Meinczinger's left lower extremity. He further opined that she remained weak and could benefit from the prescribed physical therapy. Dr. Wright encouraged her to seek a second opinion due to her continued dissatisfaction with the knee replacement. (Tr. 318.)

On December 22, 2008, Dr. Wright referred Meinczinger for physical therapy three times per week for twelve weeks. (Tr. 512.) On February 6, 2009, Ashley Miller, PT, and Karen Brown, PTA, of St. Charles Sports and Physical Therapy sent a letter to Dr. Wright regarding Meinczinger's physical therapy. The letter stated that Meinczinger attended thirty-four visits since her initial evaluation on October 28, 2008, and reported difficulty sleeping due to pain and soreness in her knee. Meinczinger reported cane use with ambulation due to her knee buckling and her fear that she would fall. Meinczinger, however, did not use her cane while at the clinic. She reported fatigue at the end of the day, especially after weight-bearing activities. She was tolerating stairs better, but reported discomfort, popping and grinding in her knee. She continued to measure 120 degrees of knee flexion and 2 degrees of hyperextension. Brown and Miller opined that she had good standing balance on her left lower-extremity, but tended to be more challenged and complained of medial knee pain when on unstable surfaces. She had minimal tightness in her hamstring and gastrocnemius. Meinczinger was consistent with physical therapy,

home exercise program, and reported using ice and pain medication daily for pain control. (Tr. 644.)

On May 26, 2009, Meinczinger visited Richard Lehman, M.D. ("Dr. Lehman"), due to her left knee condition. (Tr. 651-55.) Dr. Lehman opined that Dr. Wright did a "beautiful job" operating on her knee and that Meinczinger had "an excellent total knee [replacement]." (Tr. 654.) During the course of care, Dr. Lehman found a well healed surgical scar, a full range of motion to Meinczinger's left knee; no varus or valgus instability; no swelling; no toggle; no patellar clunk and concluded Meinczinger had what he would consider to be a "very stable knee." (Tr. 653.) Dr. Lehman believed that there was "no pathological process evidencing a cause for the pain" and that she had "excessively weak quadriceps." (Tr. 649, 653.) Dr. Lehman also noted that her subjective complaints seemed "to be somewhat in excess of her objective examination." He recommended an electromyography ("EMG") nerve conduction velocity test and a bone scan. Dr. Lehman opined that he thought it was "completely unreasonable and virtually impossible that she could be pain free" or that "further surgery could make her better in any way." (Tr. 653.)

On July 2, 2009, Dr. Lehman wrote a letter to CCMSI, Meinczinger's insurance claim administrator. Dr. Lehman reviewed the results of Meinczinger's EMG and found them negative. The bone scan led Dr. Lehman "to believe that there is no active process currently occurring in her knee." Dr. Lehman indicated that he believed she was able to work without repetitive squatting, kneeling or climbing. He opined that she was at maximum medical improvement and that no further medical treatment was warranted. He stated that there is nothing further to resolve her discomfort. (Tr. 649.)

On July 21, 2009, Dr. Lehman, in another letter to CCMSI, opined that Meinczinger was capable of "work without restrictions." He reiterated that she was at maximum medical improvement and that any treatment would be symptomatic. Dr. Lehman prescribed a topical osteoarthritis gel, patches, a walking cane, and opined that he did "not need to see her again." (Tr. 650.)

On August 26, 2009, Meinczinger saw Steven Stahle, M.D., another doctor in Dr. Lehman's office, regarding pain in her left knee. In a letter addressed to CCMSI, he indicated that Meinczinger reported that she was having difficulty going from a sitting position to a standing position, and also reported experiencing a painful shocking sensation in the posterior part of her left knee. Dr. Stahle noted that Meinczinger displayed weakness in her left quadriceps, pain associated with her left knee, and hypersensitivity around her left knee-joint. Dr. Stahle opined that he was "not sure why she [was] so hypersensitive" around her left knee-joint, nor was he able to "elicit any obvious neurologic damage" associated with her left knee. After noting the lack of abnormalities in her July 2, 2009 EMG test and bone scan, Dr. Stahle indicated that he "was not sure of the exact etiology of [her] pain." He further concluded that Meinczinger's "subjective complaints are greater than the objective findings." Dr. Stahle recommended that Meinczinger follow up with her primary care physician. In his professional opinion, Meinczinger was capable of working in accordance with Dr. Lehman's recommendations. (Tr. 657-58.)

On September 3, 2009, in another letter addressed to CCMSI, Dr. Lehman indicated that he saw Meinczinger again regarding her knee. He opined that her range of motion and her

mechanics were "quite good" and she was able to fully extend and flex her left leg. Dr. Lehman also found that Meinczinger had consistent soreness, but was unable to determine the cause. Dr. Lehman believed that Meinczinger would benefit from continued use of a cane and performance of her home exercise program. Dr. Lehman stated that he did "not believe that there is anything further that is going to resolve her pain," but he did opine that she had long-term degenerative arthritis. He again emphasized Meinczinger's cane use and home exercise program. The topical patches he prescribed had not helped and Meinczinger's pain mechanics remained about the same. (Tr. 660.)

On November 17, 2009, Meinczinger saw Ricardo Rao, M.D.,. F.A.C.S., of Midwest Vascular and General Surgery, Inc., upon recommendation from Michelle Kane, M.D. Upon physical examination, Dr. Rao found Meinczinger's foot warm and that he could not reproduce any loss of arterial circulation with his hand Doppler. He felt that the coolness she felt in her foot was a neuropathic problem related to her repeated leg surgeries. Dr. Rao also stated that Meinczinger's residual complaints were "not consistent with [his] experience with total knee operations." Dr. Rao stated that he was going to try "provocative maneuver" with a lower-extremity Doppler to try to recreate Meinczinger's foot coolness. (Tr. 663.)

In a letter dated December 1, 2009, addressed to Meinczinger, Dr. Kane wrote that Meinczinger was "having significant disability from her left knee injury and multiple unsuccessful surgeries." Dr. Kane also wrote that Meinczinger was suffering multiple ailments, including: nerve damage in her left leg; sleep apnea due to her left knee pain; weakness in left knee, which was reported to frequently "give out"; and "compensatory back pain." Dr. Kane

further wrote that Meinczinger's daily activities were being affected by her left knee problems. Dr. Kane concluded that Meinczinger was "unable to work" due to the stated issues. (Tr. 665.)

On December 2, 2009, Richard A. Koelling, D.C., of Koelling & Turnbull Chiropractic, wrote a letter addressed to "Whom It May Concern" regarding Meinczinger's physical condition. Dr. Koelling stated that Meinczinger had been under his care "for her lower back and hip complaints." Dr. Koelling wrote that Meinczinger "was suffering from a failed knee replacement" that caused problems with her "gait and hip movements." Dr. Koelling concluded that Meinczinger was "unable to walk/work without the use of a cane." (Tr. 667).

On December 22, 2009, Dr. Rao performed a lower-extremity Doppler on Meinczinger with normal results. (Tr. 669.)

On February 15, 2010, Dr. Charles Mannis, M.D., evaluated Meinczinger at the request of the Missouri Department of Social Services Disability Determination Service. Prior to his evaluation, Dr. Mannis had access to Dr. Wright's and Dr. Rao's notes and reports, respectively. In his report, Dr. Mannis noted that Meinczinger was able to get up from both a chair and the examination table without assistance. Dr. Mannis observed that Meinczinger was walking with a cane, and, with the assistance of the cane, was able to walk with a "relatively normal gait." Dr. Mannis noted that the alignment of her left knee in the standing position revealed a mild valgus alignment, as compared to her "unaffected" right knee. Dr. Mannis further observed that: Meinczinger's left knee was moderately tender; there was no palpable effusion of her knee; Meinczinger showed limited patellofemoral mobility; Meinczinger's left quadricep was slightly diminished; Meinczinger's left thigh and calf showed some signs of atrophy; and there was slight decreased sensation to pain stimulus (pinprick) along the lateral side of her left calf and lower

leg. Dr. Mannis also recorded that Meinczinger showed "satisfactory" pulse and "normal" circulatory status in her left foot. Dr. Mannis also noted that Meinczinger's left knee had a ROM of 5 to 110 degrees, compared to 0 to 150 degrees in her right knee. Dr. Mannis recorded that "the remainder of the examination [was] unremarkable." (Tr. 672-74).

Dr. Mannis determined that Meinczinger should limit her: (1) lifting to ten pounds, which, if to be performed, must be limited to only an "occasional" basis; (2) sitting to thirty minutes at a time and five hours total in any given workday; standing to fifteen minutes at a time and two hours in any given workday; and (3) walking to fifteen minutes at a time and 1 hour in any given workday. (Tr. 675-76). Dr. Mannis determined that Meinczinger "require[d] the use of a cane to ambulate," noting specifically that Meinczinger could only walk a "minimal" distance without using a cane, but nevertheless determined that she could use her free hand to carry small objects. (Tr. 676).

Dr. Mannis did not place any limitations on Meinczinger's use of her hands (both left and right), but recommended that she limit the use of her left foot to only "occasional" use. (Tr. 677). Dr. Mannis recommended that Meinczinger refrain from "climbing stairs and ramps," "climbing ladders or scaffolds," balancing, stooping, kneeling, crouching, and crawling. (Tr. 678). Dr. Mannis also recommended three "Environmental Limitations," which in detail proscribed for Meinczinger to (1) "never" expose herself to unprotected heights, (2) limit her exposure to moving mechanical parts, and (3) operate a motor vehicle only on an "occasional" basis. (Tr. 679). Notwithstanding these limitations, Dr. Mannis determined that Meinczinger could perform or participate in certain activities, including: (1) shopping; (2) traveling without a companion; (3)

13

"ambulat[ing]" without using a wheelchair, walker, two canes, or two crutches; (4) walking a

block at a "reasonable" pace on rough or uneven surface; (5) using public transportation; (6)

climbing a few steps at a "reasonable" pace with the use of a single handrail; (6) preparing a

simple meal and feeding herself without assistance; (7) caring after her personal hygiene without

assistance; and (8) sorting, handling, or using papers and files. (Tr. 680).

On March 22, 2010, Dave Rengachary, M.D., provided a letter regarding Meinczinger's

conditions.  He noted persistent pain and coldness in the left foot.  Dr. Rengachary found a

diagnosis of reflex sympathetic dystrophy to be very reasonable, and recommended referrals to

physical therapy and pain management.  He prescribed Neurontin three times per day and noted

that her response to that supported his diagnosis. (Tr. 683).

On April 1, 2010, Dr. Kane provided an additional letter. She noted chronic, daily,

disabling pain in the left leg. She further noted severe left foot pain associated with a cold foot.  Dr.

Kane stated that both a vascular surgeon and a neurologist agree with her diagnosis of reflex sympathetic

dystrophy.  She noted that this arose since her surgery in 2007, and stated that worsening pain prevents

Meinczinger from working.  Dr. Kane reiterated that Meinczinger needs a cane to walk, and noted that

pain prevents her from sleeping. (Tr. 684).

## II.    Administrative Record

The hearing before the ALJ took place on December 3, 2009.  Meinczinger appeared at

the hearing without counsel and testified.  The ALJ also heard testimony from Delores Gonzalez,

a Vocational Expert.

Meinczinger was 43 years old at the time of the hearing.  She testified that she is six feet

tall and weighs 165 pounds.  She has a high school education and can read, perform simple arithmetic, and write letters and emails.  She has a computer in the home and she uses it to communicate by email and to do limited research.

With regard to her living situation, Meinczinger told the ALJ that she lives in a ranch style home with her husband and three of her four children.  Her husband works full time and her children are full time students. She does some household chores including laundry, limited yard work and loading the dishwasher.  She testified that she cooks sometimes, but that when she does cook a meal, "[She's] usually up all night screaming and crying bloody murder." She says her children do other household work like vacuuming and taking out the trash.  Meinczinger says she does drive and goes to the grocery store.  About two months before the hearing, she and her daughter traveled to Indiana because of a death in the family.  She stated that they shared the driving duties.

The ALJ asked her about her physical limitations.  She testified that she can walk only about five minutes before she needs to rest.  She walks with a cane most of the time.  She stated that she can stand for more than five minutes but the pain becomes more excruciating and then her leg swells up if she stands for any length of time.  After she experiences the swelling, she says someone has to help her get her pants off and then she elevates and ices her leg.

Meinczinger testified that the most she can lift is a bag of sugar.  She says sitting for long periods of time is uncomfortable and when she is home, she will elevate and ice her leg if she is sitting for any period of time. She stated that she can sit for about an hour without pain.

Meinczinger testified that the last time she worked was in April of 2006. At that time she was a school bus driver. She had done that job for two years before she was fired. She stated she had knee surgery and she used 12 months of FMLA leave. The employer told her she had to be terminated because she was only allowed 12 months of leave.

Before she worked as a bus driver, Meinczinger worked at State Farm. She stated, "they were training me to do office work, billing, computer work, and sending me to class to get my license for the insurance." She stated that she was terminated from that position because they felt she was not "office material". She says she was not good with the computer. She did not retain information and could not pass the test to get her license.

She also worked at Harrah's Casino as a slot attendant. When asked about the job duties she said, "As a slot attendant, at that time was when you had to fill the machines with the big bags of money. You had to bend down, squat, kneel, and lift heavy bags of coins into the machine. You had to walk your full shift, taking care of guests, paying jackpots."

Meinczinger stated that she left the job at Harrah's because that is where she was injured. "I tripped over a manhole cover that was not flush with the floor." She testified she was terminated because of the injury.

Meinczinger also worked at the Heart of St. Charles Banquet. She testified that "the job involved setting up tables and chairs for the banquets, serving the food, doing the clean up and clearing the dishes."

She also worked as a cashier at Dierbergs grocery store for a short time. She stated she left that job because she was looking for a full time position with dental care. In addition, she

16

had a short term position working for BMV construction.  She said she helped counting trucks at a construction site.

Medical condition

The ALJ asked Meinczinger about her medical conditions.  She stated that the limited range of motion in her left knee is what keeps her from working.  She says that prevents her from kneeling, squatting, climbing and bending. She says she can climb stairs, with difficulty.

Meinczinger testified that she had surgery on her left knee when she was a teenager.  She also had surgery on that knee in 2003, twice in 2006 and once in 2007.  She stated that she has not worked since the operations in 2006.  Her last surgery was a total knee replacement.

Meinczinger stated that she also has problems with her right knee.  She has had surgery on the right knee to repair a torn meniscus.  Comparing the right knee to the left knee, she says her right knee is 100 percent better than the left.  If she did not have the problems with her left knee, Meinczinger stated that she would be able to squat, kneel and bend.  She says the right knee is often sore, and by the end of the night it is uncomfortable, but she can tolerate it.

She also testified that she has problems with her hips and back.  She was told that her hips pop out of place because she is overcompensating on her right side for the pain in her left knee.  She has seen a doctor for the hip problems and the doctors told her that her gait is off and that causes pain and pressure to her hips.  A chiropractor treats her hip problems.

With regard to her back problems, she has been told that until her knee is corrected, she will continue to have problems with her back.

The ALJ inquired about a medical record from Washington University that indicated that she could return to work with no restrictions, following the knee replacement surgery.

Meinczinger replied, "Correct. And I have papers from that physician, that physician is also the physician that did all three surgeries within 11 months. That is the same physician that I was released with low blood count. That is also the same physician that has issued me a cane, pain pills and physical therapy despite writing on the report that I am without restrictions."

Meinczinger testified about the medications that she takes for her knee pain. She stated that she takes Vicodin extra strength. She also uses Ibuprofin and Aleve. She stated that she has a prescription for a muscle relaxer, Cyclobenzaprine, the generic form of Flexeril. She testified that she takes that medication at bedtime because it makes her sleepy. She also wears a Gabapintin patch to help her back and hip muscles.

## Vocational Expert Testimony

The VE, Dolores Gonzalez testified that Meinczinger's previous jobs were sedentary or light semi-skilled positions. The ALJ posed the following hypothetical to the VE:

> [A]ssume a hypothetical [individual] with the claimant's education, training, work experience, AOD. Further assume the individual can perform light work with the following limitations: climb stairs and ramps occasionally; climb, ropes, ladders, scaffolds never; stoop, kneel, crouch -- well, stoop occasionally, kneel and crouch never; crawl, never. I'm going to add these limitations. Avoid concentrated exposure to extreme cold, wetness, humidity, vibrations. Would that individual be able to perform any past work?

The VE replied that the individual could perform the jobs of [slot] attendant[1], insurance representative, and cashier and waitress.

The ALJ then asked:

> Second hypothetical is the same as the first, however I want to move to at sit/stand option at the work site with the ability to change positions frequently. Would there

---

[1] The transcript reflects that the VE used the term flight attendant. However, Meinczinger testified that she had worked as a slot attendant in the past. The Court will treat this classification as slot attendant rather than flight attendant.

be any job that you gave me for hypothetical one that could be performed with a sit/stand option?

The VE replied no. However, she stated that a small percentage of cashier, ticket taker or order caller jobs would be available.

The ALJ then posed a third hypothetical:

My last hypothetical is in addition to the sedentary, sit/stand and in that case this, this individual would only be able to walk for five minutes at a time, stand five minutes at a time, and sit for up to an hour at a time. Would that impact the jobs that you have here for hypothetical three?

The VE stated that if the person had a sit/stand option, it would not impact the available jobs.

In the final hypothetical, the ALJ asked:

If that individual needed at least two additional breaks plus the normal two breaks, so the same thing as four, but two additional breaks along with the normal two breaks and the lunch period, would they be able to perform the jobs you gave me for hypothetical three?

The VE stated there would be no jobs.

### III. ALJ Decision

The ALJ determined that Meinczinger met the insured status requirements of the Social Security Act through December 31, 2011. The ALJ also concluded that she had not engaged in substantial gainful employment activity since May 2, 2006. The ALJ found that Meinczinger had the severe impairment of status post total left knee replacement. (Tr. 28.) The ALJ also found that the Meinczinger did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ determined that Plaintiff has the residual functional capacity to perform sedentary work

with the following restrictions: (1) she must have a sit/stand option at her work site with the ability to change positions frequently; (2) she will only occasionally be able to climb stairs and ramps; (3) she will only occasionally be able to balance; (4) she will be unable to climb ropes, ladders, or scaffolds; (5) she will be unable to stoop, kneel, crouch, and crawl; and (6) she will need [to] avoid concentrated exposure to extremes of cold, wetness, humidity and vibrations. (Tr. 31.)

The ALJ determined that through the date last insured, she was unable to perform past relevant work but that considering Meinczinger's age, education, work experience, and RFC, jobs exist in significant numbers in the regional and national economy that Meinczinger could perform. (Tr. 33.) The ALJ thus concluded that Meinczinger had not been under a disability, as defined by the Social Security Act, from May 2, 2006 through the date of his decision. (Tr. 35.)

## IV.    Appeals Council Decision

The Appeals Council explicitly adopted the ALJ's statements regarding the pertinent provisions of the Social Security Act, Social Security Administration Regulations, Social Security Rulings and Acquiescence Rulings, the issues in the case, and the evidentiary facts, as applicable. The Appeals Council also adopted the ALJ's findings or conclusions regarding whether Meinczinger is disabled, and agreed with the ALJ's findings under steps 1, 2, 3, 4, and 5 of the sequential evaluation. The Appeals Council adopted the ALJ's limitations on Meinczinger's RFC, except for the limitation on no stooping. The Appeals Council instead found that Meinczinger is limited only to occasional stooping. Additionally, the Appeals Council found Meinczinger's subjective complaints not fully credible for the reasons identified in the

ALJ's decision.  The Appeals Council thus concluded that Meinczinger had not been disabled as defined by the Social Security Act, at any time through April 23, 2010.

## V.    Legal Standard

A court's role on review is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole.  *Gowell v. Apfel*, 2542 F.3d 793, 796 (8th Cir. 2001).  Substantial evidence is less than a preponderance, but is enough so that a reasonable mind would find it adequate to support the ALJ's conclusion.  *Prosch v. Apfel*, 201 F.3d 1010, 1012 (8th Cir. 2000).  As long as there is substantial evidence on the record as a whole to support the Commissioner's decision, a court may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, *Id.*, or because the court would have decided the case differently.  *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).  In determining whether existing evidence is substantial, a court considers "evidence that detracts from the Commissioner's decision as well as evidence that supports it."  *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000) (quoting *Warburton v. Apfel*, 188 F.3d 1047, 1050 (8th Cir. 1999)).

To determine whether the decision is supported by substantial evidence, the Court is required to review the administrative record as a whole to consider:

(1)    the credibility findings made by the Administrative Law Judge;
(2)    the education, background, work history, and age of the claimant;
(3)    the medical evidence from treating and consulting physicians;
(4)    the plaintiff's subjective complaints relating to exertional and non-exertional impairments;
(5)    any corroboration by third parties of the plaintiff's impairments; and
(6)    the testimony of vocational experts when required which is based upon a proper hypothetical question.

*Brand v. Secretary of Dep't of Health, Educ. & Welfare*, 623 F.2d 523, 527 (8th Cir. 1980).

Disability is defined in the social security regulations as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. § 42 U.S.C. 416(i)(1); § 42 U.S.C. 1382c(a)(3)(A); § 20 C.F.R. 404.1505(a); 20 C.F.R. 416.905(a). In determining whether a claimant is disabled, the Commissioner must evaluate the claim using a five-step procedure.

First, the commissioner must decide if the claimant is engaging in substantial gainful activity. If the claimant is engaging in substantial gainful activity, he is not disabled.

Next, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled.

If the claimant has a severe impairment, the Commissioner evaluates whether the impairment meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

If the Commissioner cannot make a decision based on the claimant's current work activity or medical facts alone, and the claimant has a severe impairment, the Commissioner reviews whether the claimant can perform her past relevant work. If the claimant can perform her past relevant work, he is not disabled.

If the claimant cannot perform her past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy. If not, the Commissioner

declares the claimant disabled.  § 20 C.F.R. 404.1520; § 20 C.F.R. 416.920.

When evaluating evidence of pain or other subjective complaints, the ALJ is never free to ignore the subjective testimony of the plaintiff, even if it is uncorroborated by objective medical evidence.  *Basinger v. Heckler*, 725 F.2d 1166, 1169 (8th Cir. 1984).  The ALJ may, however, disbelieve a claimant's subjective complaints when they are inconsistent with the record as a whole.  *See, e.g., Battles v. Sullivan*, 992 F.2d 657, 660 (8th Cir. 1990).  In considering the subjective complaints, the ALJ is required to consider the factors set out by *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), which include:

> claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the objective medical evidence; (2) the subjective evidence of the duration, frequency, and intensity of plaintiff's pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the dosage, effectiveness and side effects of any medication; and (6) the claimant's functional restrictions.

*Id*. at 1322.

## VI.    Discussion

Meinczinger alleges two points of error in the Commissioner's decision.  First, she asserts that the Commissioner's RFC determination was not supported by substantial evidence because the Commissioner failed to include certain limitations and analyze evidence supporting those limitations.  Second, she alleges that the Commissioner failed to accord proper weight to the opinions of Meinczinger's treating providers.

## 1.    RFC Determination

The ALJ determined that Meinczinger had an RFC as follows:

> [Meinczinger] has the [RFC] to perform sedentary work as defined in 20 C.F.R.

> 404.1567(a) except that she must have a sit/stand option at her work site with the ability to change positions frequently; she will only occasionally be able to climb stairs and ramps; she will only occasionally be able to balance; she will be unable to climb ropes, ladders, and scaffolding; she will be unable to stoop, kneel, crouch, and crawl; she will need avoid [sic] concentrated exposure to extremes of cold, wetness, humidity, and vibrations.

(Tr. 31.) The Appeals Council, as the final decision of the Commissioner, adopted this RFC, apart from finding that Meinczinger could "occasionally stoop" instead of being completely precluded from stooping. (Tr. 6.) Meinczinger claims that the Commissioner failed to justify this change. She further argues that the Commissioner failed to include other limitations such as her alleged need for a cane. She asserts that her alleged need for a cane and evidence of severe degenerative arthritis and reflex sympathetic dystrophy support the "no stooping" limitation. Meinczinger thus argues that the Commissioner erred by failing to provide a narrative discussion sufficiently analyzing and describing the evidence supporting his RFC assessment as required by SSR 96-8p, and more specifically, the aforementioned evidence. Because substantial evidence supports the Commissioner's RFC finding of "no stooping," this Court will not disturb the Commissioner's findings.

The Appeals Council adopted the ALJ's findings and conclusions with the stooping determination change as the only exception. The Appeals Council explained that the ALJ clarified his intent that the claimant be limited to occasional stooping (Tr. 6.) The ALJ's comments are as follows:

> Further assume the individual can perform light work with the following limitations: climb stairs and ramps occasionally; climb, ropes, ladders, scaffolds never; stoop, kneel, crouch --well, stoop occasionally, kneel and crouch never; crawl, never.

(Tr. 88.) The ALJ then added additional restrictions for hypothetical one and each subsequent

24

hypothetical. (Tr. 88-92.) The Commissioner is not required to discuss every item of evidence in detail. *Morrison v. ApfelI*, 146 F.3d 625, 628 (8th cir. 1998). The Court may consider the Commissioner's entire analysis, not only his summary or conclusions. *Weis v. Astrue*, 552 F.3d 728, 733-34 (8th Cir. 2009). Here, it is apparent from the opinion's entirety that the inconsistencies between the medical evidence, Meinczinger's own claims, and Meinczinger's various activities form the basis of the Commissioner's opinion. *See Id.* The Commissioner specifically compared, contrasted and evaluated medical records, medical opinions, testimony and other evidence of record. He discussed and evaluated Meinczinger's own statements regarding her capacity to perform a variety of daily activities, including household chores, driving, shopping, managing money, and socializing with friends. (Tr. 32.) The Commissioner specifically found Meinczinger not fully credible and appropriately discounted her subjective complaints. *See Polaski*, 739 F.2d at 1322.

Plaintiff cites all three of Dr. Lehman's letters to CCMSI as support for her no stooping or kneeling contention. However, on May 26, 2009, Dr. Lehman opined that Meinczinger was "able to work without *repetitive* squatting, kneeling or climbing." (Tr. 654.) SSR 85-15, 1985 WL 56857, at *5, states "[s]tooping, kneeling, crouching and crawling are progressively more strenuous forms for bending parts of the body." His July 2, 2009 evaluation reiterated the May limitations, which only limited Meinczinger's capacity for the more strenuous kneeling. (Tr. 649.) On July 21, 2009, Dr. Lehman opined that Meinczinger could "work without restrictions." (Tr. 650.) This is consistent with Dr. Mannis' February 15, 2010 observation that Meinczinger was "able to arise from the chair and examining table without assistance." (Tr. 673.) The Commissioner's "occasional stooping" limitation is thus supported by substantial evidence.

Meinczinger relies on Dr. Lehman, Dr. Kane, and Dr. Koelling's prescriptions for a cane as evidence supporting the "no stooping" determination, but ignores Dr. Wright and Dr. Lehman's specific assessment that Meinczinger was able to work without restrictions, as well as the ALJ's credibility determinations regarding Dr. Kane and Dr. Koelling.

## 2.    Treating and Consultative Physicians' Opinions

"The ALJ is charged with the responsibility of resolving conflicts among medical opinions." *Finch v. Astrue*, 547 F.3d 933, 936 (8th Cir. 2008). Generally, a treating physician's opinion is given controlling weight, but is not inherently entitled to it. *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006). A treating physician's opinion "does not automatically control or obviate the need to evaluate the record as a whole." *Leckenby v. Astrue*, 459 F.3d 626, 632 (8th Cir. 2007). A treating physician's opinion will be given controlling weight if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record. 20 C.F.R. § 404.1527(d)(2); SSR 96-2p; *see also Hacker*, 459 F.3d at 937. An ALJ may discount or disregard a treating physician's opinion where other medical assessments in the record are supported by better or more thorough medical evidence, *see Rogers v. Chater,* 118 F.3d 600, 602 (8th Cir. 1997), or where a treating physician renders inconsistent opinions, *see Cruze v. Chater,* 85 F.3d 1320, 1324-25 (8th Cir. 1996); *see also Hacker*, 459 F.3d at 937 ("A treating physician's own inconsistency may also undermine his opinion and diminish or eliminate the weight given his opinions.") (citation omitted).

"A medical source opinion that an applicant is 'disabled' or 'unable to work,' however,

involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." *Ellis*, 392 F.3d at 994; *see also* 20 C.F.R. § 404.1527(e). "Whether the ALJ grants a treating physician's opinion substantial or little weight, the regulations provide that the ALJ must 'always give good reasons' for the particular weight given to a treating physician's evaluation." *Prosch v. Apfel,* 201 F.3d 1010, 1013 (8th Cir. 2000) (citing 20 C.F.R. § 404.1527(d)(2)); *see also* SSR 96-2p.

The ALJ properly declined to adopt Dr. Kane's findings because Dr. Kane pointed to no specific medical findings to support her opinion that Meinczinger was unable to work. *See Holmstrom v. Massanari*, 270 F,3d 715, 720 (explaining that treating physician's opinion will be granted controlling weight if supported by medically acceptable diagnostic techniques and if consistent with other substantial evidence in record). Further, the ALJ correctly applied applicable law to Dr. Kane's conclusory statements, citing her inconsistency with other medical sources, lack of explanation or objective support for her opinion, and her likely status as a consulting physician. (Tr. 33.) The record did not contain a single treatment note from Dr. Kane, and the ultimate determination of whether a claimant is disabled is reserved for the Commissioner. Further, her opinion is contradicted by Dr. Lehman, Dr. Stahle, and Dr. Wright. "Generally, when a consulting physician examines claimant only once, his or her opinion is not substantial evidence, especially if the treating physician contradicts the consulting physician's opinion." *Charles v. Barnhart*, 375 F.3d 777, 783 (8th Cir. 2004) (citations omitted). "However, 'an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment.'" *Id*. (citations omitted). Thus, the ALJ properly afforded Dr. Kane's opinion nominal weight.

As the ALJ noted, Dr. Mannis only saw Meinczinger on one occasion, and thus his opinion is not entitled to controlling weight. *Charles v. Barnhart*, 375 F.3d at 783. Further, the ALJ noted that Dr. Mannis' description of the severe functional limitations was at odds with her treating sources, Dr. Wright and Dr. Lehman, who both opined that Meinczinger could return to work and simply needed to avoid kneeling or more than occasional squatting or climbing. Further, his opinion is inconsistent with his own notes. For example, his opinion that Meinczinger could "never balance" is inconsistent with his opinion that she could walk an entire block at a reasonable pace on a rough or uneven surface. (Tr. 678, 680.)

The ALJ properly afforded "nominal weight" to Dr. Koelling's findings regarding Meinczinger's RFC. As a chiropractor, he is not an acceptable medical source. *See* 20 C.F.R. § 404.1513(a) & (d) *see also Vossen v. Astrue,* 612 F.3d 1011, 1014 (8th Cir. 2010). Further, as the ALJ noted, his opinions are substantially contradicted by at least three medical sources, Dr. Lehman, Dr. Stahle, and Dr. Wright. Substantial evidence thus supports the Commissioner's decision.

Here, the Commissioner properly made credibility determinations, apportioned evidentiary weight between treating physicians, consulting physicians, other medical sources, and the record as a whole. He gave adequate explanations and evidentiary support where appropriate. Further, substantial evidence supports the Commissioner's decision.

### VII.    Conclusion

Accordingly,

**IT IS HEREBY ORDERED** that under sentence four of 42 U.S.C. § 405(g), the final decision of the Commissioner of Social Security denying Lisa Meinczinger's disability benefits is **AFFIRMED**, and the Plaintiff's Complaint [Doc. 1] is **DISMISSED WITH PREJUDICE**.

Dated this <u>4th</u> day of April, 2012.

/s/Nannette A. Baker
NANNETTE A. BAKER
UNITED STATES MAGISTRATE JUDGE